IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

GLADIS BRIDGES and SABINA YARN,   )
                                  )
            Plaintiffs,           )
                                  )     Case No. 02 C 9354
      v.                          )
                                  )
METROPOLITAN WATER                )
RECLAMATION DISTRICT OF           )
GREATER CHICAGO,                  )
                                  )
            Defendant.            )

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

In their Second Amended Complaint, Plaintiffs Gladis Bridges and Sabina Yarn alleged

that Defendant Metropolitan Water Reclamation District of Greater Chicago ("the District")

discriminated against them based on their race, sex, and age; retaliated against them; and

subjected them to a hostile work environment in violation of Title VII of the Civil Rights Act of

1964, 42 U.S.C. § 2000e *et seq*. Previously, the Court granted the District's Motion to Dismiss

Plaintiff Yarn's claims of sex discrimination. Yarn's remaining claims include race

discrimination, retaliation, and hostile work environment based on race. Before the Court is the

District's Motions for Summary Judgment pursuant to Federal Rule of Civil Procedure 56(c)

against Yarn.[1] The Court grants in part and denies in part the District's Motion for Summary

Judgment as to Plaintiff Yarn for the following reasons.

---

[1] For the sake of clarity, the Court addressed the District's Motion for Summary
Judgment against Plaintiff Bridges in a separate order. *See* Docket Record Number 112-1.

## I. BACKGROUND

### A. The Parties

Defendant Metropolitan Water Reclamation District of Greater Chicago ("the District") is a local governmental unit that provides sewage treatment and related services to most of Cook County, Illinois. (R. 80-1, Def.'s Local Rule 56.1 Statement, ¶ 2.) On October 2, 1989, the District hired Plaintiff Sabina Yarn, an African-American, as a Senior Clerk Stenographer in the Maintenance and Operations Department. (Def.'s Stmt. ¶¶ 1, 3; R.102-1, Pl.'s Local Rule 56.1 Statement, ¶ 61.) Currently, Yarn is a Principal Office Support Specialist in the District's Research and Development Department. (Def.'s Stmt. ¶ 3.)

### B. Yarn's Work History in the Maintenance and Operations Department

Starting in March 1995, Ram Koduri, who is Asian, supervised Yarn while she was employed in the Waterways Section of the District's Maintenance and Operations Department.[2] (Pl.'s Stmt. ¶¶ 62, 69; Ex. 1, Pl.'s Deposition, at 25; R.79-1, Def.'s Stmt. ¶ 13, Def.'s Ex. A, Dep. Ex. 3.) Yarn was the only clerical staff member in Waterways. (Pl.'s Stmt. ¶ 66; Def.'s Stmt. ¶ 11.) Koduri assigned and directed Yarn's work responsibilities, including the filing, routing and logging of documents, and correspondence. (*Id.* ¶ 75, Def.'s Exhibits A, Dep. Ex. 3.) Further, Koduri controlled whether Yarn received overtime pay, supervised her schedule and attendance, gave Yarn her performance evaluations, and had the authority to discipline Yarn. (Def.'s Ex. A, Dep. Ex. 3; Pl.'s Dep. at 55-56, 198.)

At her deposition, Yarn testified that a few months after she started working in the Waterways Section, Koduri began to make racially-related comments, almost daily, such as black

---

[2] The parties do not explain why Ram Koduri's deposition is not part of the record.

people are uneducated, black leaders were dirty for not educating black people, and black people are lazy. (Pl.'s Stmt. ¶ 64, Pl.'s Dep. at 26-27; *see also* Def.'s Stmt ¶ 20.) Yarn further testified that Koduri made comments such as "Why don't black people go to school?" (Pl.'s Stmt., Pl.'s Dep. at 17.) Furthermore, Yarn testified that Koduri made comments about the O.J. Simpson trial and that black people should save their money for their kids' college instead of going out and buying O.J. Simpson dolls. (*Id.* at 35; *see also* Def.'s Stmt. ¶ 20.) In July of 2001, Koduri told Yarn that he felt Asians were smarter than blacks. (Pl.'s Stmt. ¶ 69.) In addition, Koduri frequently stated that Yarn would never get a promotion based on a letter she wrote to the District's Commissioner Joseph Gardner in 1994. (*Id.* ¶ 70.)

Beginning on August 24, 1999, until February 14, 2002, Yarn kept a log of her work experiences while employed in the Maintenance and Operations Department. (Def.'s Stmt. ¶ 14.) According to Yarn's log, in 1999 Koduri repeatedly stated that he wanted to help just one black kid in life and then offered to help tutor Yarn's son in math. (*Id.* ¶15.) Yarn responded to Koduri that her husband was very good in math to which Koduri replied "I don't mean at his level Sabina." (*Id.* ¶15, Def.'s Ex. A, Dep. Ex. 3.) On September 14, 1999, Yarn wrote in her log that she heard Koduri telling her co-workers that he hoped Yarn screwed up because he would enjoy writing her up. (Def.'s Stmt. ¶ 16.) On November 21, 2000, Yarn noted that Koduri asked her why do all black people hope that their kids will grow up and become basketball stars. (*Id.* ¶ 18.) The log further indicates that Koduri told Yarn that blacks waste money instead of saving for their kid's college education. (*Id.*)

As early as 1995 and through 2002, Yarn complained to the District's management about Koduri's racial insults and behavior. (Pl.'s Dep. at 29, 40.) Early on, Yarn talked to Greg

3

Cargill, the Assistant Chief Engineer, about Koduri's frequent statements concerning black people. (*Id.* at 29-30.) Yarn also spoke to the Supervising Civil Engineer, Barry Winkler, as well as his predecessor, Bill Potocek, concerning Koduri's racial insults directed toward her. (*Id.* at 36-37.) Yarn testified that she contacted both the District's EEO and Training Manager, Frances Wilkins, and Commissioner Barbara McGowan about Koduri's racial insults and behavior in 2001. (*Id.* at 50.) In late 2001, Yarn also contacted Thomas O'Connor, the Chief of Maintenance and Operations, regarding Koduri's racially insulting statements and behavior. (*Id.* at 58-60.)

In August or September of 2001, Yarn complained to Gary Ziols, the Assistant Chief Engineer and Koduri's supervisor, about Koduri's racial insults. (Def.'s Stmt. ¶ 23, Pl.'s Dep. at 41, 51.) Yarn testified that Ziols seemed sympathetic and told her he would look into her complaints. (Pl.'s Stmt. ¶ 71, Pl.'s Dep. at 42.) In September of 2001, after Yarn complained to Ziols, he instructed Koduri not to have any more closed door meetings with Yarn. (Def.'s Stmt. ¶ 24, Pl.'s Dep. at 43.) Yarn testified that she thought Ziols had talked to the District's EEO about her complaints. (Pl.'s Dep. at 45.) Yarn was also under the impression that Ziols had alerted the Director of Personnel, Matt Menze, about Koduri's behavior. (*Id.* at 44.)

Yarn further testified that although Ziols ordered Koduri not to have any more closed door meetings with her, Koduri held a closed door meeting with her and another employee in November 2001. (Pl.'s Stmt. ¶ 74.) According to her log, on January 24, 2002, Koduri held another closed door meeting with Yarn at which they had a heated conversation while discussing Koduri's harassing comments and behavior. (*Id.* ¶ 78, Def.'s Stmt., Ex. 3, at 13.) Although Koduri denied that he harassed her, Yarn contends that he told her that he would lie "to win in

4

any court battle that may come of this." (*Id.* ¶ 78, Def.'s Stmt., Ex. 3, at 13.)

The District argues that Koduri did not make racially insulting statements to Yarn after September 2001 based on Yarn's deposition testimony. (*Id.* ¶ 25.) Specifically, Yarn testified that after September 2001, "I don't think they were just racial insults any more. He just expressed anger. They weren't insults." (Pl.'s Dep. at 44.) Earlier in her deposition, however, Yarn testified that Koduri made insulting and racial statements until she filed her complaint with the District's EEO in February of 2002. (*Id.* at 36.)

According to Yarn's log, she met with the District's EEO, Frances Wilkins, on February 14, 2002, to discuss her complaints about Koduri. (Pl.'s Stmt. ¶¶ 80, 81.) Under the District's internal GS Directive 00-1, Yarn filed a complaint with the District's EEO on or about February 28, 2002, alleging that Koduri had been racially insulting her for years. (Def.'s ¶ Stmt. 29, Def.'s Ex., Dep. Ex. 3). Yarn specifically alleged: "I have been told that all blacks are poor and that Asians are naturally smarter than black people. I have been sarcastically questioned about the intentions of my so-called black leaders." (Def.'s Ex., Dep. Ex. 3.) Wilkins conducted an investigation into Yarn's complaint and concluded that Yarn had been subjected to a hostile work environment based on her race. (Pl.'s Stmt. ¶ 83.) Although Yarn believed that Koduri should be reprimanded, he was not. (Def.'s Stmt. ¶ 30.) Koduri retired from the District in June or July 2002. (*Id.*) In her deposition, Wilkins stated that Koduri would have been disciplined had he not retired. (Pl.'s Stmt., Ex. 4, Wilkins' Dep. at 86.)

## C.    Yarn's Promotional Opportunities

Yarn was on the District's Promotion List for Administrative Assistant in 1999. (Def.'s Stmt. ¶ 32.) As such, Yarn was eligible for promotion to Administrative Assistant in 2001 and

2002, and she interviewed for three vacancies in that title during that time period. (*Id.* ¶¶ 33, 34; Pl.'s Stmt.¶ 126.) The District did not select Yarn for these vacancies. (Def.'s Stmt. ¶ 34.) Instead, the District hired other candidates in September 2001 and December 2002 to serve as Administrative Assistants in the Research and Development Department. (*Id.* ¶¶ 34, 36, 37.) The District did not fill the third position due to budgetary restraints. (*Id.* ¶ 34.) In her deposition testimony, Yarn admits that she did not know the background or prior work experience of the Administrative Assistants who the District promoted over her. (*Id.* ¶¶ 36, 37.) Koduri did not interview Yarn for any of these vacancies. (*Id.* ¶ 40.)

### D. Yarn's Work History in the Purchasing Department

In March 2002, Matt Menze, the Director of Personnel, recommended that Yarn transfer to the Purchasing Department. (Pl.'s Stmt. ¶¶ 87, 88.) Yarn's first supervisor in the Purchasing Department was Christine Daly. (Def.'s Stmt. ¶ 45.) In May 2002, Richard Barrett became Yarn's supervisor. (Pl.'s Stmt. ¶ 90.) Barrett supervised other clerical staff in the Purchasing Department, although Yarn was the only black clerical employee under Barrett's supervision. (*Id.* ¶ 91.) Barrett did not know of Yarn's previous discrimination complaint until after she left the Purchasing Department in September of 2002. (Def.'s Stmt. ¶ 50.)

While in the Purchasing Department, Yarn created a database for logging purchase orders after she discovered that the Department's prior logging method was inadequate. (Pl.'s Stmt. ¶ 105; Def.'s Stmt. ¶ 51.) Yarn created an administrative password to log on to the database due to the important information that it contained. (Def's Stmt. ¶ 51; Pl.'s Stmt. ¶ 108.) Yarn showed her co-worker, Elizabeth Wiezsaecker, how to use the purchase order log database, but later told Wiezsaecker to go back to the old way of logging purchase orders because Wiezsaecker was

6

manipulating the database. (Pl.'s Stmt. ¶¶ 107, 109, 110.)

In September of 2002, Yarn transferred to the District's Research and Development Department in Stickney, Illinois. (*Id.* ¶ 103; Def.'s Stmt. ¶ 52.) On or about September 9, 2002, the day before Yarn was to leave the Purchasing Department, Yarn emailed the database to herself and made the database inaccessible to the Purchasing Department's server. (Def.'s Stmt. ¶ 52.) Shortly thereafter, Wiezsaecker used a backup tape of the database, but she could not change any field definitions or manipulate the user instructions without the administrative password. (*Id.* ¶ 53.) When requested, Yarn refused to give the password to the computer security analyst. (Pl.'s Stmt. ¶ 114; Def.'s Stmt. 56.) Accordingly, a pre-disciplinary meeting was held on September 17, 2002. (*Id.*) At the pre-disciplinary meeting, an Assistant Purchasing Agent warned Yarn that if she did not give the Purchasing Department the password, they would discipline her. (Def.'s Stmt. ¶ 56.)

In late September of 2002, Yarn finally emailed the database and user password to the Director of Research and Development. (*Id.* ¶ 58.) On October 3, 2002, the District notified Yarn that based on the Purchasing Agent and Department Head Darlene LoCascio's recommendation, the District was suspending Yarn for 30 days pending termination charges for attempting to circumvent security, to damage or destroy District property, and insubordination. (*Id.* ¶ 59; Pl.'s Stmt. ¶ 104.) Shortly thereafter, the Director of Personnel notified Yarn that her suspension was amended to 21 days. (*Id.*)

### E. Yarn's EEOC Charge

On October 10, 2002, Yarn filed an EEOC charge alleging that the District discriminated against her based on race and retaliated against her by subjecting her to a racially hostile work

environment, failing to promote her, and suspending her. (Def.'s Stmt. ¶ 31.)

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A genuine issue of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

## III.    STATUTE OF LIMITATIONS

### A.    Title VII

Under Title VII, a plaintiff must file an employment discrimination charge with the EEOC within 300 days "after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e-5(e)(1); *see also National R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 104-05, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002). In general, federal courts only consider evidence from this 300-day period when making Title VII determinations. *Dandy v. United Parcel Serv., Inc.,* 388 F.3d 263, 270 (7th Cir. 2004). Because the statute of limitations is not jurisdictional, however, it is subject to equitable considerations. *Id.*

#### 1.    Hostile Work Environment Claim

The District argues that because Yarn did not file her EEOC charge until October 10,

2002, her actionable Title VII claims are limited to the alleged discriminatory conduct occurring after December 5, 2001, that is, 300 days prior to her EEOC charge. *See id.* On the other hand, Yarn contends that Koduri's racial insults and comments started in March 1995 and continued through February of 2002, and thus the equitable doctrine of a continuing violation allows the Court to consider pre-December 5, 2001, occurrences of racial discrimination.

A plaintiff may establish a continuing violation under one of the following theories: (1) the employer made employment decisions over a period of time making it difficult for the employee to determine the actual date of discrimination; (2) the employer relied on an express policy of discrimination; or (3) the separate acts of discrimination were part of an ongoing pattern and at least one of the acts occurred within the relevant limitations period. *See Tinner v. United Ins. Co. of Am.*, 308 F.3d 697, 707-08 (7th Cir. 2002); *see also National R.R. Passenger*, 536 U.S. at 120.

Here, Yarn contends that Koduri's constant racial insults and continued anger toward her were part of an ongoing pattern of race discrimination. In *National Railroad*, the Supreme Court held that the statute of limitations precluded recovery for discrete acts of discrimination occurring outside the limitations period, but that courts can consider "the entire scope of a hostile work environment claim, including behavior alleged outside the statutory time period ... for the purposes of assessing liability, so long as an act contributing to that hostile environment takes place within the statutory time period." *Id.* at 105; *Dandy,* 388 F.3d at 270. In other words, it does not matter that some of the component acts of a hostile work environment claim fall outside the statutory time period, as long as one act took place within the limitations period. *National R.R. Passenger,* 536 U.S. at 117. Accordingly, Yarn is required to establish that one contributing

9

act took place after December 5, 2001. *See id.* at 105.

Based on its interpretation of Yarn's deposition testimony, the District argues that Koduri stopped making racial statements to Yarn in September 2001, and thus no contributing acts took place during the limitations period. Examining Yarn's deposition testimony as a whole, and viewing the evidence in a light most favorable to her, Yarn has created a genuine issue of material fact concerning Koduri's continued harassment after September 2001 until she filed her complaint with the District's EEO in February 2002. Therefore, Yarn's hostile work environment claim is not time-barred, and thus the Court can consider the behavior outside of the statutory period.[3]

### 2.    Failure to Promote Claim

Next, the District asserts that Yarn's failure to promote claim based on an Administrative Assistant position filled in September 2001 is time-barred because Yarn's EEOC charge was not filed until October 10, 2002, which is over 300 days after the District promoted someone else. Likewise, the District argues that Yarn's allegations regarding the denial of compensation for extra duties and overtime opportunities that are based on incidences that took place from 1991 to October 2001 are also time-barred. Yarn does not argue that the Court should equitably toll the

---

[3] The District argues that Koduri's apology to Yarn on September 10, 2001, and the fact that Koduri's supervisor told him not to have closed door meetings with Yarn are intervening acts, and thus the incidents occurring after September 10, 2001, are not part of the same hostile work environment claim as earlier incidents. *See National R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 118, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002). To establish that an employer's action is an intervening act, however, the action must significantly change the employee's working conditions. *Williams v. City of Chicago,* 325 F.Supp.2d 867, 875 (N.D.Ill. 2004). The District fails to argue why or how Yarn's working conditions significantly changed, and indeed, they did not, as evidenced by Koduri's continued closed door meetings with Yarn.

statute of limitations or that the District engaged in an ongoing pattern of discrimination as it pertains to her failure to promote or denial of extra compensation claims. Indeed, the record does not support an equitable exception to the statute of limitations in this instance. Therefore, Yarn cannot rely on the September 2001 incident to support her failure to promote claim. Further, Yarn's claim that the District denied her additional compensation based on pre-December 5, 2001, conduct is also time-barred.

**B.     42 U.S.C. § 1981**

Yarn additionally argues that because Plaintiff Gladis Bridges' original pro se complaint alleged discrimination claims under 42 U.S.C. § 1981, the four year statute of limitations under Section 1981 applies to her present claims as alleged in the Second Amended Complaint. *See Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 124 S.Ct. 1836, 1845 (2004); *Dandy*, 388 F.3d at 268-69. Yarn's attorney, however, moved for leave to amend the original pro se complaint, which the Court granted. Bridges and Yarns then filed an amended complaint that did not include any claims based on Section 1981. Plaintiffs also amended the complaint after the Court dismissed parts of the First Amended Complaint. The Second Amended Complaint does not contain claims based on Section 1981 either. Yarn's "relation back" argument based on Federal Rule of Civil Procedure 15(c) does not save the day because the relation back doctrine concerns whether an amendment to a complaint relates back for the purpose of the period of limitations, *see Ellzey v. United States*, 324 F.3d 521, 525 (7th Cir. 2003), and not whether original claims can be resuscitated to support the argument that the Court should extend the

11

limitations period.[4]

## IV.   ANALYSIS

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any

individual, or otherwise to discriminate against any individual with respect to his compensation,

terms, conditions, or privileges of employment, because of such individual's race, color, religion,

sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

### A.   Hostile Work Environment Claim

First, Yarn contends that Koduri subjected her to a racially hostile work environment.

Title VII prohibits an employer from "requiring people to work in a discriminatorily hostile or

abusive environment." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d

295 (1993). To prevail on a hostile work environment claim, a plaintiff must establish that: (1)

she was subjected to unwelcome harassment; (2) the harassment was based on her race; (3) the

harassment unreasonably interfered with her work performance by creating an intimidating,

hostile, or offensive work environment; and (4) there is a basis for employer liability. *Luckie v.

Ameritech Corp.,* 389 F.3d 708, 713 (7th Cir. 2004). The District makes no arguments

concerning Koduri's unwelcome harassment under the first element or that the harassment was

not based on Yarn's race under the second element. Therefore, the Court turns to the third and

fourth elements of Yarn's hostile work environment claim to determine whether there is a

genuine issue of material fact for trial.

---

[4] The Court notes that Title VII and 42 U.S.C. § 1981 have the same liability standards;
therefore, the Court's denial of Yarn's request to "relate back" to Bridges' pro se complaint only
affects her statute of limitations argument and not her substantive claims in the Second Amended
Complaint. *See EEOC v. Pipefitters Ass'n Local Union 597,* 334 F.3d 656, 658 (7th Cir. 2003).

## 1. Hostile Work Environment

The District argues that Yarn's "allegations do not rise to the level of severe and pervasive conduct required to state a claim of hostile work environment." To qualify as "hostile" under the third prong, the work environment must be "both objectively and subjectively offensive." *Rhodes v. Illinois Dep't of Transp.*, 359 F.3d 498, 505 (7th Cir. 2004). In deciding whether particular conduct creates an objectively hostile work environment, courts examine the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris,* 510 U.S. at 23.

Examining the totality of Yarn's working conditions, the Court concludes that Yarn has presented evidence upon which a reasonable jury could find that Koduri's conduct was sufficiently severe or pervasive to create a hostile work environment. Yarn has presented evidence that Koduri frequently, if not daily, made racially-based comments and insults that were humiliating in nature. Some of Koduri's comments that support the Court's conclusion, include (1) black people are uneducated and black leaders are dirty for not educating black people, (2) black people should save their money for their kids' college instead of going out and buying O.J. Simpson dolls, and (3) Asians are smarter than blacks. Koduri also repeatedly remarked that he wanted to help just one black kid in life by offering to tutor Yarn's son in math, yet insulted Yarn when she responded that her husband was good in math. Further, Koduri asked Yarn such questions as why do all black people hope that their kids will grow up and become basketball stars.

13

## 2. Employer Liability

The Court now turns to the fourth element of Yarn's hostile work environment claim. The standard for employer liability turns on whether the alleged harasser was the plaintiff's supervisor or co-worker. *See Faragher v. City of Boca Raton,* 524 U.S. 775, 787, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). Harassment by a supervisor triggers strict liability subject to any affirmative defenses. *McPherson v. City of Waukegan,* 379 F.3d 430, 438 (7th Cir. 2004). A "supervisor" is someone who has the power to directly affect the terms and conditions of an plaintiff's employment, such as hiring, firing, demoting, promoting, transferring, or disciplining an employee. *Hall v. Bodine Elec. Co,* 276 F.3d 345, 355 (7th Cir. 2002). To be a supervisor, the individual is not required to have authority over all of an employee's terms and conditions of employment, so long as the supervisor has been entrusted with at least some authority. *Id.* (citing *Parkins v. Civil Constructors of Ill., Inc.,* 163 F.3d 1027, 1034 (7th Cir. 1998)).

In a footnote, the District argues that Koduri was not a supervisor, but merely Yarn's co-worker. The evidence in the record, however, establishes that Koduri had considerable discretion over Yarn's work assignments, schedule, and discipline. In fact, Koduri assigned and directed Yarn's work responsibilities, controlled whether Yarn received overtime pay, and supervised Yarn's work schedule and attendance. Moreover, Koduri evaluated Yarn's work performance and had the authority to discipline her. Although there is evidence in the record that Koduri did not interview Yarn as part of the clerical staff promotional process, Koduri is not required to have authority over all of Yarn's terms and conditions of employment to be considered Yarn's supervisor. *Id.* Therefore, the Court concludes that Koduri qualifies as a supervisor; thus, the District is strictly liable subject to any affirmative defenses. *See McPherson,* 379 F.3d at 438.

### 3. The District's Affirmative Defense

The Supreme Court has established an affirmative defense for employers where

supervisors have created a hostile work environment. *See Burlington Indus., Inc. v. Ellerth,* 524

U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998); *Faragher v. City of Boca Raton*, 524 U.S.

775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). In *Ellerth,* the Supreme Court stated:

> An employer is subject to vicarious liability to a victimized employee for an
> actionable hostile environment created by a supervisor with immediate (or
> successively higher) authority over the employee. When no tangible employment
> action is taken, a defending employer may raise an affirmative defense to liability
> or damages, subject to proof by a preponderance of the evidence .... The defense
> comprises two necessary elements: (a) that the employer exercised reasonable care
> to prevent and correct promptly any [racially] harassing behavior, and (b) that the
> plaintiff employee unreasonably failed to take advantage of any preventive or
> corrective opportunities provided by the employer or to avoid harm otherwise ....
> No affirmative defense is available, however, when the supervisor's harassment
> culminates in a tangible employment action, such as discharge, demotion or
> undesirable reassignment.

*Ellerth,* 524 U.S. at 764-65. First, in order for the *Ellerth/Faragher* defense to be available, the

District must not have taken any tangible employment actions against Yarn. *See McPherson,* 379

F.3d at 439. There is no evidence, however, that the District took any tangible employment

actions against Yarn while she was working in Waterways. Thus, the Court turns to the other

requirements under this affirmative defense – whether the District exercised reasonable care to

promptly prevent and correct any harassing behavior and whether Yarn unreasonably failed to

take advantage of the District's preventive or corrective opportunities. *See Ellerth*, 524 U.S. at

764-65.

Here, the record reflects that Yarn complained to Koduri's supervisors and other

managers within the District throughout the relevant time period, yet the District did nothing to

15

prevent or correct Koduri's harassing behavior. Specifically, Yarn complained of Koduri's frequent racial statements to Greg Cargill, the Assistant Chief Engineer; Barry Winkler, the Supervising Civil Engineer; Bill Potocek, Winkler's predecessor; Gary Ziols, the Assistant Chief Engineer; Frances Wilkins, the District's EEO and Training Manager; and Commissioner Barbara McGowan. In late 2001, Yarn also contacted Thomas O'Connor, the Chief of Maintenance and Operations, about Koduri's racially insulting statements and behavior. Although there is evidence in the record that after Yarn spoke with Ziols about Koduri's behavior, Ziols attempted to take some action, there is also evidence in the record that Koduri's behavior did not improve after September 2001, namely, that he continued to have closed door meetings with Yarn. Therefore, the District has failed to establish the first prong of its *Ellerth/Faragher* defense.

Next, the District argues that because Yarn did not use GS Directive 98-6 to process her informal complaints of discrimination, she did not take advantage of the District's preventive and corrective opportunities as required under *Ellerth*. In her deposition, however, the District's EEO and Training Manager, Frances Wilkins, testified that department heads have the responsibility to report race discrimination charges. (Pl.'s Stmt., Ex. 4, Wilkins' Dep. at 86.) As discussed above, Yarn complained to the two separate Supervising Civil Engineers during the relevant time period and Koduri's direct supervisors, yet it appears that only Ziols may have reported Yarn's complaints to Wilkins sometime in 2001. In addition, Wilkins' deposition testimony indicates that Yarn was not aware of the District's procedure for the receipt and processing of informal complaints. (*Id.*) Consequently, the District has not established that Yarn unreasonably failed to take advantage of the District's preventive or corrective opportunities. *See*

16

*Ellerth,* 524 U.S. at 764-65. Because the District cannot avail itself of the *Ellerth/Faragher* defense, the Court denies the District's motion for summary judgment as to Yarn's hostile work environment claim based on Koduri's conduct.[5]

### B.     Race Discrimination – Failure to Promote Claim

Yarn claims that the District failed to promote her to Administrative Assistant because of her race. Yarn does not present any direct evidence to support this claim. Thus, the Court turns to the indirect method of establishing a prima facie case of race discrimination based on the failure to promote, which requires Yarn to show (1) she is a member of a protected class, (2) she applied for and had the requisite qualifications for the promotion, (3) her employer denied her the promotion, and (4) her employer promoted a non-protected member who was not more qualified than she. *Dandy,* 388 F.3d at 273; *Grayson v. City of Chicago,* 317 F.3d 745, 748 (7th Cir. 2003). If Yarn fails to make out a prima facie case of race discrimination, the Court does not reach the question of whether Yarn established that the District's reasons for promoting others is pretext for discrimination. *See Grayson,* 317 F.3d at 748.

As discussed above, allegations pertaining to the September 2001 promotion are time-barred. The Court thus looks to the District's failure to promote Yarn in December of 2002. The District contends that Yarn has not established the fourth prong of the test, *i.e.,* that the District

_____

[5] Although Yarn argues that her supervisors in the Purchasing Department, Christine Daly and Richard Barrett, created a racially hostile work environment, she does not support this argument with facts in the record. Indeed, the record does not support a hostile work environment claim based on Barrett's and Daly's actions because Yarn has not alleged any incidents that have a racial character. *See Luckie v. Ameritech Corp.,* 389 F.3d 708, 713 (7th Cir. 2004) (actions must be sufficiently connected to race to fulfill second element of hostile work environment claim). Accordingly, the Court grants the District's motion for summary judgment as to Yarn's hostile work environment claim based on Barrett's and Daly's conduct.

promoted a non African American who was not more qualified than Yarn. Indeed, Yarn has not

provided the Court with a way to measure the candidates who were promoted over her. *See*

*Dandy,* 388 F.3d at 274. In fact, Yarn admits in her deposition testimony that she did not know

the background or prior work experience of the Administrative Assistants who the District

promoted over her. Yarn has thus failed to establish that the candidates who were hired instead

of her were not more qualified, and therefore, her failure to promote claim fails. The Court

accordingly grants the District's motion for summary judgment as to this claim.

## C.    Other Race Discrimination Claims

In her Second Amended Complaint, Yarn alleges that the District treated her differently

than similarly situated non African American employees in many aspects of her work, including

discipline, work assignments, and overtime opportunities. Because Yarn does not provide any

direct evidence supporting her race discrimination claim, the Court turns to the indirect method

of proof. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668

(1973). To establish a prima facie case of race discrimination, a plaintiff must show that (1) she

is a member of a protected class, (2) she was meeting her employer's legitimate expectations, (3)

she suffered an adverse employment action, and (4) her employer treated similarly-situated

employees outside her protected class more favorably. *Id.*; *Sartor v. Spherion Corp.,* 388 F.3d

275, 279 (7th Cir. 2004). A plaintiff must establish each element of a prima facie case before the

Court reaches the issue of pretext. *Herron v. DaimlerChrysler Corp.,* 388 F.3d 293, 300 (7th Cir.

2004).

### 1.    Maintenance and Operations Department

As to her race discrimination claim based on alleged discriminatory conduct while she

was working in the Maintenance and Operations Department, the District contends that Yarn has failed to establish that she suffered a materially adverse employment action under the third prima facie element. Courts have defined "adverse employment action" broadly to include such actions as "hiring, firing, failing to promote, reassignment with significantly different responsibilities, or some other action causing a significant change in benefits." *Ellerth,* 524 U.S. at 761; *McKenzie v. Milwaukee County,* 381 F.3d 619, 625 (7th Cir. 2004).

Other than her failure to promote allegations as discussed above, there is no evidence in the record that Yarn suffered an adverse employment action while working in the Maintenance and Operations Department. For instance, there is no evidence that Koduri or anyone else in Waterways took any tangible employment actions against Yarn such as firing or reassigning her. *See McKenzie,* 381 F.3d at 625. In addition, Yarn has made no arguments in her brief to the Court concerning what she considers to be the adverse employment actions at issue. Consequently, Yarn has not established that there was a quantitative or qualitative change in the terms or conditions of her employment. *See Haywood v. Lucent Techs., Inc.,* 323 F.3d 524, 532 (7th Cir. 2003). Because Yarn has not demonstrated that she suffered an adverse employment action, her disparate treatment claim based on her work in the Maintenance and Operations Department fails.

### 2. Purchasing Department

Yarn further alleges that her supervisors in the Purchasing Department, Barrett and Daly, discriminated against her based on her race by modifying her lunch breaks and duties; routinely and arbitrarily re-assigning her duties to a white female clerical staff member; and excluding her from meetings. Yarn further alleges that Barrett ignored her.

19

Under the *McDonnell Douglas* burden shifting method of establishing discriminatory intent, the Court concludes that Yarn has failed to establish the fourth element of her retaliation claim – that she was treated less favorably than similarly situated employees outside of her protected class. To establish that an employee is similarly situated, Yarn must first show that there is another co-worker who is directly comparable to her in all material respects. *See Patterson v. Avery Dennison Corp.,* 281 F.3d 676, 680 (7th Cir. 2002). Court looks to certain relevant factors when determining whether employees are directly comparable, including whether the employees have the same or similar job, were subjected to the same standards, were supervised by the same person, and had comparable experience, education, and other qualifications. *Ajayi v. Aramark Bus. Serv., Inc.,* 336 F.3d 520, 532 (7th Cir. 2003).

Here, Yarn has failed to establish that any of her co-workers were directly comparable to her in all material respects. Yarn presents evidence of other clerical staff in the Purchasing Department, including their names and that they are not African American. Yarn, however, fails to set forth their job responsibilities, background, or what standards they followed. Without more, the Court has no way of measuring whether the District treated similarly situated employees who were not African American more favorably than Yarn. *See Dandy,* 388 F.3d at 274. As such, Yarn's racial discrimination claim based on allegations of Barrett's and Daly's discriminatory conduct fails.

**D. Retaliation Claim**

Finally, Yarn contends that the District has retaliated against her ever since she wrote a letter to Commissioner Joseph Gardner in 1994 concerning compensation for additional jobs that she performed. From that moment on, Yarn alleges, she was blacklisted from promotions and

her supervisors in the Purchasing Department arbitrarily modified and reassigned her duties.

A plaintiff may pursue a retaliation claim through either the direct or indirect methods of establishing discriminatory intent. *Stone v. City of Indianapolis Pub. Utils. Div.,* 281 F.3d 640, 644 (7th Cir. 2002). Under the first method, a plaintiff must present direct evidence of a statutorily protected activity, an adverse employment action, and a causal connection between the two. *See Haywood v. Lucent Tech., Inc.,* 323 F.3d 524, 531 (7th Cir. 2003).

Under the direct method, Yarn contends that there is a causal connection between her discrimination complaint and her October 2002 suspension based on her failure to turn over the password to the Purchasing Department. Yarn bases her argument on the fact that her suspension was in close temporal proximity to the filing of her discrimination complaint in February 2002. To determine whether a causal connection exists, Yarn's supervisor, Barrett, must have had actual knowledge that Yarn filed a discrimination complaint in the first instance. *See Luckie,* 389 F.3d at 714-15. Barrett testified, however, that he was not aware of Yarn's discrimination complaint until after she left the Purchasing Department. Furthermore, the Purchasing Agent and Department Head, Darlene LoCascio, gave the final recommendation to suspend Yarn and, she too, was unaware of Yarn's previous discrimination complaints. (Def.'s Stmt., Ex. D; Ex. G. LoCascio Aff. ¶ 5.) Therefore, no causal connection exists.

The Court thus turns to whether Yarn can establish a retaliation claim under the indirect method. To do so, Yarn must show that (1) she engaged in a protected activity, (2) she was performing her job according to her employer's legitimate expectations, (3) she suffered an adverse employment action, and (4) she was treated less favorably than similarly situated employees who did not engage in the statutorily protected activity. *Luckie v. Ameritech Corp.,*

389 F.3d 708, 714 (7th Cir. 2004). Under the indirect method, a plaintiff's failure to satisfy one prima facie element is fatal to her retaliation claim. *Hudson v. Chicago Transit Auth.,* 375 F.3d 552, 560 (7th Cir. 2004).

Again, Yarn has failed to establish the fourth element of her retaliation claim, namely, that she was treated less favorably than similarly situated employees who did not file discrimination complaints. As discussed above, Yarn has not established that the other clerical staff members in the Purchasing Department were directly comparable to her in all material respects. *See Patterson,* 281 F.3d at 680. Further, the record does not support the conclusion that there were comparable employees in the Waterways Section of the Maintenance and Operations Department.

In addition, as to her retaliation claim concerning the Waterways Section, Yarn has failed to establish that she suffered an adverse employment action under the third element of a prima facie case of retaliation. In other words, besides her failure to promote claim as discussed above, Yarn has not established that she was fired, reassigned with significantly different responsibilities, or that some other action caused a significant change in her work. *See McKenzie,* 381 F.3d at 625. Because Yarn has failed to establish a prima facie case of retaliation, the Court grants the District's motion for summary judgment as to this claim.

## CONCLUSION

For these reasons, the Court grants in part and denies in part Defendant's Motion for

Summary Judgment as to Plaintiff Sabina Yarn.

Dated: January 20, 2005

**ENTERED**

**AMY J. ST. EVE**
**United States District Court Judge**